IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

JEFFREY BLACK,

     PLAINTIFF

     vs

THE CITY OF NEW YORK, a municipal entity,
NEW YORK CITY POLICE and COMMAND OFFICERS
"JOHN and MARY DOES", individually and in
their official capacities, NEW YORK CITY POLICE
OFFICER JOHNN LUONGO, Shield # 777, individually
and in his official capacity, NEW YORK CITY
POLICE SERGEANT RONALD MYERS, Shield # 05146,
individually and in his official capacity, NEW
YORK CITY POLICE CAPTAIN ANTHONY BOLOGNA,
individually and in his official capacity, MICHAEL
BLOOMBERG, individually and in his official capacity
as Mayor of the City of New York, RAYMOND KELLY,
individually and in his official capacity as Police
Commissioner of the City of New York, THOMAS GRAHAM,
individually and in his official capacity as Commander,
Disorders Control Unit, New York City Police Department,
BRUCE SMOLKA, individually and in his official capacity
as Assistant Chief of Patrol, Patrol Borough Manhattan
South, New York City Police Department, TERRENCE MONAHAN,
individually and in his official capacity as Deputy
Chief, Patrol Borough Bronx, New York City Police
Department, JOHN J. COGLAN, individually and in his
official capacity as Deputy Chief and Commanding Officer,
Pier 57, New York City Police Department, JOSEPH ESPOSITO,
individually and in his official capacity as Chief of
the New York City Police Department, LIEUTENANT JOHN WOLF,
individually and in his official capacity, LIEUTENANT
SCOTT AHEARN, individually and in his official capacity,
LIEUTENANT FREDERICK DERENTHAL, individually and in his
Official capacity, SERGEANT THOMAS CRIMMINS, individually
and in his official capacity,

     DEFENDANTS

_____

05 Civ 3616/KMK/JCF
PLAINTIFF'S SECOND
AMENDED COMPLAINT
[JURY TRIAL]

## I.  INTRODUCTION

1.  This is an action against the Defendant parties,
individually and collectively, for the violation of the
Plaintiff's federally guaranteed constitutional and civil rights

and his rights as otherwise guaranteed under the laws and Constitution of the State of New York.

2.  This case arises out of the arrest of the Plaintiff, Jeffrey Black, on August 31, 2004 at or about 8:00 P.M. in the vicinity if 35th Street between 5th and 6th Avenues, New York City while he was engaged in First Amendment protected speech activity associated with the convening of the Republican National Convention meetings then taking place in New York City.

3.  The Plaintiff seeks monetary damages for his wrongful false arrest, detention and incarceration and for subjecting him to unnecessary and excessive and unreasonable force in connection with his stop and arrest and for subjecting him to unnecessary and excessive and unreasonable terms and conditions of his stop, seizure and detention including subjecting the Plaintiff to an improper, unlawful, and wrongful and unnecessary and unreasonable search; and for, deliberately and with reckless disregard for the health and welfare and well being of the Plaintiff, subjecting the Plaintiff to an  environmentally dangerous and hazardous detention facility; and, otherwise, for subjecting the Plaintiff to unnecessary and excessive and unreasonable conditions of his detention and confinement and, otherwise, for the violation of the Plaintiff's federally guaranteed constitutional and civil rights and for the violation of his rights as guaranteed under the laws and Constitution of the State of New York; and the Plaintiff seeks whatever other relief is appropriate and necessary in order to serve the interests of justice and assure that his remedy is full

and complete.

## II. JURISDICTION

4.    Jurisdiction of this Court is invoked pursuant to and under 28 U.S.C. Sections 1331, 1332, and 1343 [3] and [4] in conjunction with the Civil Rights Act of 1871, 42 U.S.C. Section 1983, and the Fourth and Fourteenth Amendments to the United States Constitution.

5.    Jurisdiction is also invoked pursuant to and under 28 U.S.C. Section 1367, entitled Supplemental Pendent Party Jurisdiction. The Plaintiff requests that the Court exercise its powers to invoke pendent claim and pendent party jurisdiction.

6.    The Plaintiff and the Defendants have diversity of citizenship and, therefore, diversity jurisdiction also exists in this matter, pursuant to 28 U.S.C. Section 1332, independent of other federal Court jurisdiction predicates as described above. The Plaintiff resides in Maine and did so at the time of the incident.   The Defendants all reside in the State of New York and are citizens of the State of New York. The value of the rights in question is in excess of one hundred thousand dollars exclusive of interest and costs and the injuries suffered for the violation of the rights are themselves significant.

7.    The State law claims have a common nucleus of operative fact with the federally based claims and they arise out of the same transaction and occurrence giving rise to the Plaintiff's federally based claims and causes of action.

8.   The Plaintiff also invokes the jurisdiction of this Court in conjunction with the Declaratory Judgment Act, 28 U.S.C. Sections 2201, et seq., this being an action in which the Plaintiff, while seeking monetary damages, also seeks declaratory and injunctive relief if such is deemed necessary and desirable and in the interest of justice in order to provide the Plaintiff with a full and complete remedy for the violation of his rights.

9.   This is an action in which the Plaintiff seeks relief for the violation of his rights as guaranteed under the laws and Constitution of the United States and the laws and Constitution of the State of New York.

### III.  PARTIES

10.  The Plaintiff is an American citizen who resides in Bernard, Maine.

11.  Defendants "John and Mary Does", John Luongo, Shield # 777, Sergeant Ronald Myers, Shield # 05146, Lieutenant John Wolf, Lieutenant Scott Ahearn, Lieutenant Frederick Derenthal, Sergeant Thomas Crimmins, and Captain Anthony Bologna, are New York City Police and Command Officers. They are sued in their individual and official capacities. Notwithstanding the wrongful and illegal nature of their acts and conduct as hereinafter described, they were taken in and during the course of their duties and functions as employees and agents of the City of New York and incidental to the otherwise lawful performance of the same.

12.  Defendant City of New York is a municipal entity existing

pursuant to and under the laws and Constitution of the State of New York and having the authority thereunder to maintain and operate, as it does, a police agency as part of its City government structure.

13.  Michael Bloomberg is the Mayor of the City of New York.

14.  Raymond Kelly is the Police Commissioner of the City of New York. Thomas Graham is the Commander of the Disorders Control Unit of the City of New York, Bruce Smolka is an Assistant Chief, Patrol Borough Manhattan South, of the New York City Police Department. Terrence Monahan is a Deputy Chief, Patrol Borough Bronx, New York City Police Department. John J. Coglan is a Deputy Chief and Commanding Officer, Pier 57, New York City Police Department. Joseph Esposito is Chief of the New York City Police Department. All are sue in their individual and official capacities.

## IV.  ALLEGATIONS

15.  The Plaintiff is twenty seven years of age. The Plaintiff's birth date is April 7, 1978.

16.  The Plaintiff resides at # 5 Mitchell Road in Bernard, Maine.

17.  The Plaintiff was born and raised in Beloit, Wisconsin.

18.  The Plaintiff moved to Maine in 1996 in order to attend the College of the Atlantic in Bar Harbor. Maine [Mount Desert Island] and graduated therefrom in the fall of 2001 with a B.A. in Human Ecology.

19.   During the 1997-1998 school year, the Plaintiff traveled abroad with the International Honors Program. During his travels abroad, which focused his academic studies on issues of global economics, development, and environmental crisis, the Plaintiff visited England, India, New Zealand, the Philippines, and Mexico.

20.   Subsequent to his graduation from the College of the Atlantic, the Plaintiff was employed in the AmeriCorp program. The Plaintiff coordinated the MDI [Mount Desert Island] Time Dollar Program.  The Plaintiff did so from approximately August 2003 until approximately October 2004 or thereabouts. The Program operated in the Bernard, Maine community and communities proximate thereto, all of which were on Mount Desert Island. Specifically, the Plaintiff coordinated a "time bank" which is a system of barter that facilitates the trade of services, without the use of money, in return for non monetary benefits and remuneration. All members pay or receive one "time dollar" for every hour of service regardless of what the service is. At present the organization operates as MDI Time Bank.

21.   In between the Plaintiff's academic pursuits and since his graduation from the College of the Atlantic, the Plaintiff has focused a great deal of his energy and pursuits on issues pertaining to globalization, environmental degradation, and social justice.  The Plaintiff has received remuneration for work in the afore-described efforts and has otherwise waited tables and done work and been compensation through a time -hour barter program.

6

22.   The Plaintiff currently volunteers for GE Free Maine, an organization which is working against the contamination of genetically engineered food into the food supply.  In addition, the Plaintiff participates in the MDI Time Bank, MDI Peace and Justice and is otherwise engaged in helping to organize the Burdock Festival, a gathering focused on promoting a "free and sustainable future".

23.   The Plaintiff traveled to New York City from his residence in Maine to attend the First Amendment protected speech activities associated with the convening of the of the Republican National Convention in New York City during the period of time August 30, 2004 through September 2, 2004.

24.   The Plaintiff traveled to New York as described and for the purpose described in order to have a voice and to express such over his concerns about the Bush administration's policies.

25.   The Plaintiff's intended was to arrive in New York City on Monday, August 30, 2004, the date on which the Republican National Convention meetings were expected to commence.

26.   The Plaintiff intended to participate in what he understood would be a "Poor Person's march" on Monday, August 30, 2004, when he arrived in New York City on that date. The Plaintiff hoped that, when he and others participated in any demonstration activities on either the 320th or 31st, he and his fellow demonstrators  would be able to get as close to the Madison Square

7

Garden facility, where the Republican National Convention meetings were being held, as was possible so as to be visible to those attending the Convention meetings and, by such, to more effectively convey the First Amendment protected speech activity qua message of protest to those attending the Republican national Convention meetings in and at Madison Square Garden.

27.  The Plaintiff intended to leave, after his participation in the afore-described activity on August 31, 2004, and to return to Maine. The Plaintiff expected to return to Maine with his girlfriend, Kyla Hershey-Wilson, and with Jada Wilner both of whom had traveled to New York City, independent of the Plaintiff, in order to participate in the First Amendment protected speech activities associated with the convening and meeting of the Republican National Convention at the Madison Square Garden facility in New York City.

28.  The Plaintiff traveled to and arrived in New York City on August 30, 2004.

29.  When the Plaintiff arrived in New York City, he met up with his girlfriend, Kyla Hershey Wilson, and another friend from Maine, Jada Wilner. Kyla Hershey-Wilson and Jada Wilner had traveled to New York City from Maine independent of the Plaintiff. The Plaintiff and his girlfriend and Jada Wilner stayed at the residence of the Plaintiff's friend in Brooklyn, New York.

30.  The incident giving rise to this litigation commenced on August 31, 2004 at about 9:00 P.M. when the Plaintiff, along with

Kyla Hershey-Wilson, Jada Wilner, and many other individuals were engaged, at the time, in First Amendment protected speech activity associated with the Republican National Convention meetings then on-going in New York City.

31.  The Plaintiff, Kyla Hershey-Wilson and Jada Wilson left Brooklyn, New York on August 31, 2004 and went to Manhattan where they anticipated participating in First Amendment protected speech activities [rallies, marches, and demonstrations and protests] related to the Republican National Convention meetings then being held in New York City.

32.  Because of police barricades, it was difficult, if not impossible, to "convene" with other demonstrators in an organized manner and fashion; and, accordingly, the Plaintiff and Kyla Hershey-Wilson and Jada Wilner walked around endeavoring to become engaged with and involved in an organized demonstration and to get as close to Madison Square Garden was possible [within eye shot of such] so that their "voices", actual and symbolic, could be heard and so that they could be seen by those persons attending the Republican National Convention meetings in and at the Madison Square Garden facility.

33.  At or about the time of the Plaintiff' arrest on August 31, 2004 at or about 9:00 P.M., the Plaintiff and Jada Wilner and Kyla Hershey-Wilson, along with others in the vicinity, were still endeavoring, to get to the Madison Square Garden facility when, in the vicinity of 35th Street between 5th and 6th Avenues, they were

blocked in by police barricades and directed to get on the
sidewalk. When directed to do so, police were moving toward where
the Plaintiff was situated from one end of the street while police
barricades existed at the other end of the street.  In other
words, the Plaintiff and others were, at the time that they were
directed to get on the sidewalk, being penned in by police
actions.

34.  The Plaintiff, Jada Wilner, and Kyla Hershey-Wilson
complied with the police order to get on the sidewalk.

35.  At or about that time, the Plaintiff obtained a peach and
a bottle of water from someone who was passing such food/beverage
out to those other persons involved in the demonstration who had
been directed to move to the sidewalk and had complied, as had the
Plaintiff, Jada Wilner, and Kyla Hershey-Wilson, so done. The
water and fruit cart, from which the afore-described individual
gave the Plaintiff the peach and a bottle of water, was left in
the street when the police directed people in the street to move
to the sidewalk; and, eventually, when people, including the
Plaintiff were arrested, the Plaintiff observed his arresting
Officer, at or about the time herein described, stomping on fruit
and what appeared to be an Indy Media photographer's camera.

36.  At the same time, people, then on the sidewalk, were
asking how they could leave.

37.  In response to those inquiries then being shouted out by
persons on the sidewalk, the police responded that all those on

10

the sidewalk were being arrested; and, immediately, police began arresting people including the Plaintiff and, as it turned out, Kyla Hershey-Wilson.

38.   The Plaintiff' arresting officer, believed to be Defendant New York City Police Officer "John Rowe", Shield # 777, started to cuff the Plaintiff at which time a superior officer began to push the Plaintiff into the crowd of people. The Plaintiff told the superior office that he was then being handcuffed and apparently arrested at which time the Plaintiff's arresting officer completed the cuffing and left the Plaintiff on the street,

39.   Thereafter, the Plaintiff' s arresting officer brought the Plaintiff from the street to a standing position and began leading the Plaintiff down the street.

40.   At that time, the Plaintiff was placed in what he describes as a "compliance" hold, which caused the Plaintiff's right arm to be moved up behind his neck [all while he was rear cuffed] near his shoulder. In addition to pulling the Plaintiff's right hand/arm up behind the Plaintiff's head, the Plaintiff's arresting officer also repeatedly twisted the Plaintiff's hand/arm. It was a repetitive twisting which Plaintiff believes resulted in a sprained hand.

41.   Such caused the Plaintiff severe pain and the Plaintiff indicated to his arresting officer that he was in pain and he was not resisting and that the officer was hurting him.

42.   All the while, the Plaintiff's arresting officer
tightened the cuffs and placed his knee in the Plaintiff's back,
the conduct of which as described caused the Plaintiff further
pain and suffering and which caused the Plaintiff, as her had been
doing, to tell his arresting officer that the officer was hurting
him and causing him severe pain and damage to his- the Plaintiff's
body, and that he—the Plaintiff, was complying and not resisting.

43.   The Plaintiff's arresting officer responded, in
substance, that the Plaintiff will be in more pain later on and
that, if the officer got the Plaintiff alone, he would really feel
pain; that, if he—the Plaintiff, did not pass some test he—the
Plaintiff, would really be in pain.

44.   The Plaintiff continued to ask his arresting officer what
he had to do to stop his arresting officer from inflicting the
pain.  The Plaintiff's arresting officer simply tightened the
Plaintiff's cuffs further and directed the Plaintiff to walk in a
straight line, as the Plaintiff was endeavoring notwithstanding
the Plaintiff's labor in doing so because of the pain which the
Plaintiff's arresting officer was inflicting, unnecessarily,
unreasonably, and punitively and sadistically, upon the Plaintiff.

45.   As the Plaintiff was walking, his arresting officer
lifted the Plaintiff off the ground and propelled the Plaintiff
into a mirror which was sticking out from a vehicle which was
situated in the area. The conduct caused the Plaintiff to feel
pain as he was propelled into the vehicle's mirror.

12

46.  The Plaintiff was taken to a police transport vehicle where the Plaintiff's arresting officer took the Plaintiff's glasses off and placed them in Plaintiff's pocket.  The Plaintiff's arresting officer than claimed that the Plaintiff had a knife and went into the Plaintiff's pocket, took the Plaintiff's glasses, which the arresting officer had just put into the Plaintiff's pocket, out of the pocket and placed such in a bag of some sort [believed to be, perhaps, an evidence bag].

47.  The Plaintiff's arresting officer than frisked the Plaintiff and asked the Plaintiff how much money he possessed to which the Plaintiff responded.

48.  The Plaintiff's arresting officer than took the Plaintiff's money and, in a manner and fashion which concealed what he—the arresting officer, was doing, he counted the money and informed the Plaintiff that he—the Plaintiff had a sum which was ten dollars less than what the Plaintiff had informed the arresting officer he—the Plaintiff, possessed. The Plaintiff's arresting officer then counted the Plaintiff's money in a fashion which allowed the Plaintiff to see such and the amount, as counted, was ten dollars short of the sum which the Plaintiff  had indicated to his arresting officer that he—the Plaintiff, possessed.

49.  The Plaintiff was photographed, with his arresting officer, outside of the transport vehicle.

50.  While at the transport vehicle, the Plaintiff informed

two superior officers that he was in pain from his handcuffing but they ignored such.

51.   The Plaintiff was placed in the transport vehicle.

52.   While in the transport vehicle, the Plaintiff's arresting officer entered and removed the plastic cuffs, with which he had been initially handcuffed and which then were still on the Plaintiff and causing him pain; and the Plaintiff's arresting officer placed a second set of handcuffs on the Plaintiff in a rear cuffing position.

53.   In removing the handcuffs and replacing them, the Plaintiff's arresting officer cut the cuffs. In doing so, the Plaintiff's arresting officer cut the Plaintiff's right wrist. In that regard, the blade of the instrument did not cut the Plaintiff's wrist.  Rather a hole was gouged in the Plaintiff's wrist by forcing the plastic tool, when removing the handcuffs, when the tool could not fit between the Plaintiff's wrist and the handcuffs.

54.   The Plaintiff's arresting officer twisted the newly placed handcuffs in a manner and fashion to cause the Plaintiff pain.

55.   Furthermore and at that time the Plaintiff's arresting officer was cutting the initial handcuffs and replacing them with a second set of handcuffs, the Plaintiff's arresting officer elbowed the Plaintiff in the eye, causing the Plaintiff substantial pain.

56. Moreover, the Plaintiff's arresting officer pretended to vomit on the Plaintiff.

57. The Plaintiff was transported to a facility known as "Pier 57", where he was retained and imprisoned.

58. It is believed that Pier 57, which is located, it is believed, in the vicinity of 15th Street and the Hudson River, was an old bus depot.

59. It is believed, as well, that, when the City of New York obtained the use of that facility for the purpose of imprisoning individuals arrested at the Republican National Convention, the City of New York knew or should have known that the facility was deleterious to the well being, health, and welfare of individuals who would be imprisoned there because of the existence of chemicals, toxins, and filth all of which, individually and collectively, placed individuals at an increased risk to their health, welfare, and well being.

60. Notwithstanding that the City knew or should have known of the increased risks to the well being, health, and welfare of arrestees detained and imprisoned at Pier 57 because of the environmental conditions at Pier 57, including the existence of chemicals, toxins, and filth, the Defendants, including the Defendant City and its policy makers, intentionally, recklessly, and with deliberate indifference ignored the same and, by such, elected to utilize this health risk increasing facility when they knew or should have known that there were  other less health and

welfare risk imposing alternatives available to them within which to detain and imprison individuals arrested at the Republican National Convention meetings.

61.  While at the Pier # 57 facility, the Plaintiff was moved around to several locations within the facility.

62.  On several occasions, the Plaintiff requested medical assistance but the Plaintiff's requests were simply ignored,

63.  While incarcerated at the Pier 57 facility, the Plaintiff was photographed a number of times including on one occasion when he was directed by his arresting officer to pose in what the Plaintiff can only describe as a sexually provocative manner and fashion.

64.  While at Pier 57, the Plaintiff's cut, on his risk, was exposed to chemicals which were on the floor of the Facility causing the cut on the wrist to become infected.

65.  Because of the chemicals and toxic environment at Pier # 57, the Plaintiff had a great deal of difficulty breathing.

66.  In addition, the Plaintiff's body and clothes were full of chemical material and sludge type material which chemical and sludge type material was on the floor and in the environment of and at the Pier # 57 facility,

67.  Eventually, the Plaintiff was transported to Manhattan Central Booking.

68. While at Central Booking, some individual looked at the Plaintiff when the Plaintiff indicated that he was in pain and

that his wrist was hurting him terribly.

69.   After several failed attempt to request medical attention and while being detained in a cell, the Plaintiff' arresting officer, whom the Plaintiff did not realize was then at the facility, came by the Plaintiff's cell and indicated to the Plaintiff that he did not have any idea that the Plaintiff was injured and such was the first time he had heard about the same.

70.   The Plaintiff's arresting officer then indicated to the Plaintiff that the Plaintiff was all set to be processed and that he would be out of the facility within a half hour and that it was Plaintiff's choice whether to go to a hospital which, if the plaintiff elected to do so, would delay the Plaintiff's release by a day.

71.   Based on what the Plaintiff's arresting officer informed him, the Plaintiff, believing hat he would be processed and released within one half hour, declined, at that time, to go to a hospital even though his wrist was causing him tremendous pain and he believed that it might even be broken.

72.   Subsequently and when as half hour passed and nothing was happening with respect to the Plaintiff's release, the Plaintiff sought further medical treatment and two medics appeared, touched and felt the Plaintiff's wrist, and advised the Plaintiff that it appeared to him that he did have a fracture and that, if the Plaintiff wanted, he could go to a hospital. The Plaintiff indicated that he wanted to go to the hospital but, thereafter,

17

declined to do so, out of fear, when he was informed that he would be leaving the facility, alone, with his arresting officer.

73.   The Plaintiff's wrist was looked at, on another occasion, after being fingerprinted and just before the Plaintiff was informed that he would heading out of the area to what the Plaintiff was told would be his arraignment.

74.   At that time, an officer made an announcement that anyone with injuries or needing to see a medic should come out of the line, in which the Plaintiff was situated, and that such would be addressed at that time.   The Plaintiff asked for a sling so that it would be easier to walk to a hospital from  what he anticipated would be his release from the facility in the near future. The Plaintiff was taken to a desk where a woman, who the Plaintiff believed was EMS related personnel, looked at the Plaintiff's wrist. That individual, appearing to be up-set about the condition of the Plaintiff's wrist, called for an ambulance and appeared to document the injury in a report. Rather than being taken to the hospital in an ambulance at that point for treatment, the Plaintiff was shifted back into the system where he waited for several hours only then to be taken into a courtroom, for his arraignment, rather than to a hospital for treatment/.

75.   Eventually and approximately twenty five hours after his arrest and detention, the Plaintiff was arraigned.

76.   The Plaintiff was arraigned on two charges of disorderly conduct.

77.  The Plaintiff pled not guilty and was released on his own recognizance.

78.  The Plaintiff was otherwise "crime offense" eligible for a Desk Appearance Ticket.

79.  The Plaintiff did not have any outstanding warrants.

80.  The Plaintiff cooperated with the law enforcement agents at the time of his arrest and, otherwise, while detained and imprisoned at Pier # 57 and at Central.

81.  The Plaintiff provided his name and address and possessed corroborating identification.

82.  Notwithstanding that the Plaintiff was Desk Appearance Ticket qualified and qualifiable, the Plaintiff was not released, after perhaps three or four hours, if that, associated with the processing of a Desk Appearance Ticket but rather he was detained an imprisoned and held until an arraignment, approximately twenty five hours after he was arrested and taken into custody.

83.  The Plaintiff was required to appear in Court, post arraignment, on one other occasion, perhaps one month later. At that time, the charges against the Plaintiff were adjourned in contemplation of dismissal.

84.  There was no probable cause for the arrest and preferral of criminal charges against the Plaintiff; and there was no otherwise legitimate law enforcement purpose for the arrest and detention and imprisonment of the Plaintiff.

85.  The Plaintiff was arrested and detained and imprisoned

19

for collateral objectives which collateral objectives were law enforcement convenience and an improper philosophy of getting people, who were legitimately and lawfully engaged in First Amendment protected protest speech activity associated with the Republican National Convention then on going in New York City, off the streets so that the City of New York could put its "best face" on for the people attending the Republican National Convention and for the world at large which was looking at the Convention and New York City, particularly since the President of the United States, was preparing to be re-nominated by delegates attending  the Republican National Convention for that office and was going to be in New York City in connection therewith.

86.  The Plaintiff was falsely arrested and maliciously prosecuted and otherwise subjected to malicious abuse of criminal process and was otherwise subjected to unreasonable terms and conditions of his custodial seizure and detention, the latter of which included being photographed in what can only be described as sexually provocative contexts and including the theft of money and including being deliberately and recklessly and intentionally and indifferently subjected to a toxic environment while he was in the custody of the City of  New York,

87.  The Plaintiff was arrested and detained and imprisoned in retaliation for his legitimate exercise of his First Amendment protected protest speech activities and for the collateral objective of getting him –and others, off the "street" and out of

the "public eye" while the Republican National Convention meetings were on going in New York City.

88.   The Plaintiff was subjected, by the nature and extent and manner and fashion of his handcuffing, to excessive, unreasonable and unnecessary force.

89.   In addition and otherwise, the Plaintiff was subjected to excessive and unnecessary force in the course of his arrest, detention and incarceration including being propelled into the mirror of a vehicle and including being cut in the wrist, and including being elbowed in the eye.

90.   The actions and conduct of the law enforcement agents herein were propelled by the New York City policies, practices, practices, procedures, related to the policing of the Republican National Convention protest demonstrations which were anticipated would take place and did, in fact, take place during the multi-day Republican National Convention meetings at the end of August, 2004 and the beginning of September, 2004.

91.   The Republican National Convention demonstration policing policies, practices, procedures, and protocols and initiatives were predicated on an "ends justifies the means" philosophy.

92.   In expectation of demonstration to be conducted by individuals at the Republican National Convention, the Defendant City of New York and the Defendant Mayor and the Defendant New York City Police Department policy makers and command officers adopted policies, practices, and customs and procedure, and

protocols which propelled arrests, detention and imprisonment of
individuals, including the Plaintiff's arrest, detention, and
imprisonment, where there was otherwise no basis for the arrest
and, then, to detain the individuals, including the Plaintiff,
excessively and unnecessarily, and punitively, rather than to
release the individuals, after arrest, with Desk Appearance
Tickets or Summonses in a timely manner and fashion proximate to
the arrest itself, and, in association with the custodial
detention and imprisonment, to subject the individuals, including
the Plaintiff, to unnecessary, unreasonable, and excessive terms
and conditions of the seizure and detention including unnecessary,
excessive, unreasonable force, fingerprinting. Photographing, and
intentionally and recklessly and with deliberate indifference
subjecting the detained and imprisoned arrestees, including the
Plaintiff, to a toxic environment and health detrimental
conditions which increased the risk to the Plaintiff 's health,
well being, and welfare.

93.  The policies and practices and customs adopted by the
City of New York and implemented by its agents and employees
during the Republican National Convention, propelled officers to
act outside of the bounds of constitutionally prescribed conduct
and to push the envelope thereby subjecting the Plaintiff, among
others, to false arrest, excessive and unreasonable and
unnecessary force including but not limited to excessive,
unnecessary, and excessive handcuffing and to otherwise subject

the Plaintiff to unnecessary, unreasonable and excessive terms and conditions of his seizure including unnecessary, excessive, and unreasonable photographing, fingerprinting, excessive and unreasonable detention, and imprisonment and detention in hostile, toxic, health detrimental, and welfare detrimental conditions.

94.   The law enforcement agents who arrested Jeffrey Black and who otherwise took actions against him as herein described are agents and employees of the City of New York. Although their actions and conduct herein described were unlawful and unconstitutional and otherwise wrongful, those actions and conduct were taken by the law enforcement agents in the performance of their duties and functions as New York City Police Officers and as employees and agents of the City of New York and incidental to their otherwise lawful performance of their duties and functions.

95.   Jeffrey Black physical and psychological suffered injuries and damages as a consequence of his arrest, detention, all associated therewith [including photographing, fingerprinting, and all other associated therewith including the excessive physical force associated with his arrest, the excessive and the absence of medical treatment, and the removal and withholding of the Plaintiff's glasses, among other things as described herein].

96.   Jeffrey Black suffered physical pain, mental anguish, emotional distress, and psychological trauma, fear, and humiliation and embarrassment. He also suffered the lost of his liberty and anxiety distress and anguish and fear associated

therewith. He also suffered physical pain in connection with the
unreasonable, unnecessary, and excessive force associated with the
frisk conducted of him at the time the Plaintiff was arrested on
the street. Jeffrey Black continues to suffer residual physical
and psychological pain.

97.   As to the removal and withholding of the Plaintiff's
glasses, the Plaintiff suffered particular mental distress and
anxiety and emotional anguish.   The Plaintiff was in what was a
fear inducing situation.

98.   When the Plaintiff got to the Pier 57 facility, the
Plaintiff noticed that some of the other arrestees were wearing
their eye glasses.

99.   At a table, the Plaintiff was asked to sign what he
believes to be a property voucher form.   The Plaintiff could not
read such because he did not have his glasses.

100.   Just before he sat down, the Plaintiff was shown a bag
and asked if the bag contained his property.   The Plaintiff looked
at the bag [bring it up very close to his eyes because he could
not otherwise see]; and saw in the plastic bag his glasses. The
Plaintiff's glasses looked fine, then, while in the bag.

101.   The Plaintiff informed that the property in the bag was
his property. Then, the Plaintiff was told to sit down and
everything in the bag, except for his glasses [which the Plaintiff
had observed in the bag], were removed from the bag and placed on
the table in front of the Plaintiff.

102.   The Plaintiff's glasses were not initially placed on the table.   The Plaintiff's arresting officer was sitting opposite of/to the Plaintiff.

103.   The arresting officer then, with the bag, appeared to do something with the bag that was out of the eye sight of the Plaintiff [with the Officer's upper body arm movement]; and, thereafter, he produced the Plaintiff's glasses which, at that point, were, rather than being in the previously observed good shape, bent in the middle and otherwise twisted.

104.   The Plaintiff asked that his glasses be returned to him so that he could put them on and wear them and see [even if their bent and twisted fashion].

105.   The Plaintiff was informed that such was not allowed and they were needed as evidence.

106.   The value of the damages and injuries suffered by the Plaintiff has not yet been specifically quantified but the value is substantial in nature.

107.   The actions, conduct, policies, and practices and customs herein described violated Jeffrey Black's rights as guaranteed under the First, Fourth and Fourteenth Amendments to the United States Constitution and the Civil Rights At of 1871, 42 U.S.C. Section 1983.

108.   The actions, conduct, policies, practices and customs herein violated Jeffrey Black's rights under the laws and Constitution of the State of New York including but not limited to

false arrest, false imprisonment, excessive detention, assault, battery, and subjecting him to health detrimental, toxic, and welfare detrimental conditions of imprisonment, and malicious prosecution, and the malicious abuse of criminal process, and the invasion of privacy and the excessive and unnecessary imposition of the terms and conditions of the Plaintiff's seizure.

109.   The actions, conduct, policies and practices were negligent and the proximate cause of the Plaintiff's injuries and damages.

110.   The Plaintiff has no other adequate remedy at law but for the institution of this litigation.

## V.   CAUSES OF ACTION

### A.   FIRST CAUSE OF ACTION

111.   The Plaintiff reiterates Paragraph #'s 1 through 110 and incorporates such by reference herein.

112.   The Plaintiff was subjected to an unlawful and a false arrest and false imprisonment in violation of the Plaintiff's rights under the Civil Rights Act of 1871, 42 U.S.C. Section 1983, and Fourth Amendment to the United States Constitution.

113.   The Plaintiff suffered injuries and damages.

### B. SECOND CAUSE OF ACTION

114.   The Plaintiff reiterates Paragraph #'s 1 through 113 and incorporates such by reference herein.

115.   The Plaintiff was, inter alia, falsely arrested and falsely imprisoned in violation of the laws and Constitution of

26

the State of New York.

116.  The Plaintiff suffered injuries and damages.

### C. THIRD CAUSE OF ACTION

117.  The Plaintiff reiterates Paragraph #'s 1 through 116 and incorporates such by reference herein.

118.  The Plaintiff was subjected to an unnecessary and unreasonable and excessive detention and imprisonment in violation of his rights as guaranteed under the Fourth Amendment to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

119.  The Plaintiff suffered injuries and damages.

### D.  FOURTH CAUSE OF ACTION

120.  The Plaintiff reiterates Paragraph #'s 1 through 119 and incorporates such by reference herein.

121.  The  Plaintiff  was  subjected  to  an  unnecessary  and unreasonable and excessive detention and imprisonment in violation of his rights under the laws and Constitution of the State of New York.

122.  The Plaintiff suffered injuries and damages.

### E.  FIFTH CAUSE OF ACTION

123.  The Plaintiff reiterates Paragraph #'s 1 through 122 and incorporates such by reference herein.

124.  The  Plaintiff  was  subjected  to  excessive,  unreasonable and unnecessary force in violation of his rights as guaranteed under the Fourth Amendment to the United States Constitution and

the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

125.  The Plaintiff suffered injuries and damages.

F.  SIXTH CAUSE OF ACTION

126.  The Plaintiff reiterates Paragraph #'s 1 through 125 and incorporates such by reference herein.

127.  The Plaintiff was subjected to an assault and battery in violation of his rights under the laws and Constitution of the State of New York.

128.  The Plaintiff suffered injuries and damages.

G.  SEVENTH CAUSE OF ACTION

129.  The Plaintiff reiterates Paragraph #'s 1 through 128 and incorporates such by reference herein.

130.  The Plaintiff was intentionally and recklessly and with deliberate indifference subjected to terms and conditions of his detention and imprisonment, by being detained and imprisoned in an environmentally hazardous facility which increased the risk to the Plaintiff's health, well being, and welfare in violation of the Plaintiff's rights, in violation of his rights as guaranteed under the Fourth and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

131.  The Plaintiff suffered injuries and damages.

H.   EIGHTH CAUSE OF ACTION

132.   The Plaintiff reiterates Paragraph #'s 1 through 131 and incorporates such by reference herein.

133.   The Plaintiff was recklessly and with deliberate indifference subjected to terms and conditions of his detention and imprisonment, by being detained and imprisoned in an environmentally hazardous facility which increased the risk to the Plaintiff's health, well being and welfare, in violation of the Plaintiff's rights under the laws and Constitution of the State of New York.

134.   The Plaintiff suffered injuries and damages.

I. NINTH CAUSE OF ACTION

135.   The Plaintiff reiterates Paragraph #'s 1 through 134 and incorporates such by reference herein.

136.   The Plaintiff was subjected to his arrest, detention and imprisonment and all of the excessive terms and conditions of his detention and imprisonment and seizure including the excessive, unreasonable and unnecessary force and including the excessive, unnecessary, and excessive detention, and including the otherwise unnecessary, excessive and unreasonable conditions of his detention and imprisonment including fingerprinting and photographing and including the environmentally hazardous facility which subjected the Plaintiff to risk to his health, well being, and welfare, in retaliation for the exercise of his First Amendment guarantee speech activity and as a result of the

29

Plaintiff's exercise of his First Amendment protected speech activity in violation of the Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

137.  The Plaintiff suffered injuries and damages.

### J. TENTH CAUSE OF ACTION

138.  The Plaintiff reiterates Paragraph #'s 1 through 137 and incorporates such by reference herein.

139.  The Plaintiff was subjected to the intentional infliction of mental distress because the seizure and the terms and conditions of seizure were excessive and malicious and otherwise designed to punish the Plaintiff for the exercise of his First Amendment protected speech activity and not for a legitimate law enforcement purpose; and such violated the Plaintiff's rights under the Fourteenth Amendment to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

140.  The Plaintiff suffered injuries and damages.

### K.  ELEVENTH CAUSE OF ACTION

141.  The Plaintiff reiterates Paragraph #'s 1 through 140 and incorporates such by reference herein.

142.  The Plaintiff was subjected to intentional infliction of mental distress  by, among other things, the shocking and outrageous imposition of verbal threats and the shocking and outrageous photographing of the Plaintiff in sexually provocative contexts, in violation of the Plaintiff's rights under the laws

and Constitution of the State of New York.

143.  The Plaintiff suffered injuries and damages.

### L.   TWELFTH CAUSE OF ACTION

144.  The Plaintiff reiterates Paragraph #'s 1 through 143 and incorporates such by reference herein.

145.  The Plaintiff was subjected to malicious prosecution in violation of his rights under the Fourth Amendment to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

146.  The Plaintiff was suffered injuries and damages.

### M.   THIRTEENTH CAUSE OF ACTION

147.  The Plaintiff reiterates Paragraph #'s 1 through 146 and incorporates such by reference herein.

148.  The Plaintiff was subjected to malicious prosecution.

149.  The Plaintiff suffered injuries and damages.

### N.   FOURTEENTH CAUSE OF ACTION

150.  The Plaintiff reiterates Paragraph #'s 1 through 149 and incorporates such by reference herein.

151.  The Plaintiff was subjected to malicious abuse of criminal process in violation of his rights under the Fourteenth Amendment to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

152.  The Plaintiff suffered injuries and damages.

### O.   FIFTEENTH CAUSE OF ACTION

153.  The Plaintiff reiterates Paragraph #'s 1 through 152 and

incorporates such by reference herein.

154.  The Plaintiff was subjected to malicious abuse of
criminal process in violation of the Plaintiff's rights under the
laws and Constitution of the State of New York.

155.  The Plaintiff suffered injuries and damages.

### P.  SIXTEENTH CAUSE OF ACTION

156.  The Plaintiff reiterates Paragraph #'s 1 through 155 and
incorporates such by reference herein.

157.  The policies and practices which propelled the actions
and conduct of the Officers herein violated the Plaintiff's rights
under the First, Fourth and Fourteenth Amendments to the United
States Constitution and the Civil Rights Act of 1871, 42 U.S.C.
Section 1983.

158.  The Plaintiff suffered injuries and damages.

### Q.  SEVENTEENTH CAUSE OF ACTION

159.  The Plaintiff reiterates Paragraph #'s 1 through 158 and
incorporates such by reference herein.

160.  The policies and practices which propelled the actions
and conduct of the Officers herein violated the Plaintiff's rights
under the laws and Constitution of the State of New York.

161.  The Plaintiff suffered injuries and damages.

### R.  EIGHTEENTH CAUSE OF ACTION

162.  The Plaintiff reiterates Paragraph #'s 1 through 161 and
incorporates such by reference herein.

163.  Independent of the Monell claim and federal jurisdiction

associated therewith, the City of New York is responsible, under State law, for the wrongful conduct of the Officers pursuant to and under the doctrine of respondeat superior.

164.   The Plaintiff suffered injuries and damages.

S.   NINETEENTH CAUSE OF ACTION

165.   The Plaintiff reiterates Paragraph #'s 1 through 155 and incorporates such by reference herein.

166.   The actions, conduct, and policies, practices –some or all, were negligent and the proximate cause of the Plaintiff's injuries and damages.

167.   The Plaintiff suffered injuries and damages.

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction herein and thereafter:

[a]   Assume pendent party and pendent claim jurisdiction.

[b]   Enter appropriate declaratory and injunctive relief.

[c]   Award appropriate compensatory and punitive damages in an amount to be defined and determined.

[d]   Award reasonable costs and attorney's fees.

[e]   Award such other and further relief as the Court deems appropriate and just.

[f]   Convene and empanel a jury.

DATED: New York, New York
       December 17, 2005

                              Respectfully submitted,

                              _____
                              JAMES I. MEYERSON [JM 4304]
                              396 Broadway-Suite # 601
                              New York, New York 10013
                              [212] 226-3310
                              ATTORNEY FOR PLAINTIFF
                              BY:_____

34